IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

BRANCH BANKING AND
TRUST COMPANY,

                Plaintiff,

v.                                CIVIL ACTION NO. 3:18-0486

MERIDIAN HOLDING COMPANY, LLC
a West Virginia limited liability company;
GREGORY L. HOWARD, JR.;
ROGER J. HARRIS, JR.; and
MICHAEL C. DRAGOVICH,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is a Motion for Summary Judgment filed by Plaintiff Branch Banking and Trust Company on February 14, 2020. *Mot. for Summ. J.*, ECF No. 76. Plaintiff filed sixteen exhibits and a memorandum of law along with its Motion. *Pl.'s Exs.*, ECF Nos. 76-1–16; *Mem. in Support of Mot. for Summ. J.*, ECF No. 77. Defendants filed a Response in Opposition to Plaintiff's Motion on March 13, 2020, *Resp. in Opp'n*, ECF No. 80, along with seven exhibits, *Defs.' Exs.*, ECF No. 80-1–7. Plaintiff filed a Reply one week later. *Reply*, ECF No. 81. The issues have been fully briefed and Plaintiff's Motion is ripe for review. For the reasons set forth below, the Court **GRANTS** the Motion and **ORDERS** this case removed from its docket.

**I. BACKGROUND**

Though this action was not initiated until March 2018, its roots lie in a Promissory Note ("Note") executed nearly a decade earlier by Defendant Meridian Holding Company, LLC ("Meridian") and its members Gregory Howard, Roger Harris, and Michael Dragovich. *See Pl.'s*

*Ex. A*, ECF No. 76-1, at 2–5.[1]  The Note provided that Meridian would repay an $858,276.62 loan from Plaintiff over five years at an annual interest rate of 5.875%. *Id.* at 2. Failure to make required payments constituted a material default under the Note, and Plaintiff retained the right to "pursue its full legal remedies at law or equity" to remedy such a default. *Id.* at 3. While the Note also referenced the possibility of future modifications to its terms, it provided that "[n]o waivers and modifications shall be valid unless in writing and signed by" Plaintiff and that no such modifications "shall in any manner affect, limit, modify, or otherwise impair any rights, guaranties or security of the holder not specifically waived, released, or surrendered in writing." *Id.* at 4.

Incorporated into the Note is a Deed of Trust granting Plaintiff an interest in a property located at 2401 Sissonville Drive in Charleston, West Virginia. *Pl.'s Ex. C*, ECF No. 76-3, at 10. Defendants agreed that they would maintain the property—which acted as security on the Note— "in as good order and repair as it now is," and that they would "neither commit nor permit any waste or any other occurrence or use which might impair the value of the Property." *Id.* at 3. At the time the Note was executed, the Sissonville Drive property was assessed at $1,135,000.00. *See Pl.'s Ex. D*, ECF No. 76-4, at 3. The individual defendants—Howard, Harris, and Dragovich— jointly and severally guaranteed Meridian's debt on the Note. *Pl.'s Ex. B*, ECF No. 76-2, at 2.

Over the following years, the parties entered into three written modifications and one change in terms agreement that altered the interest rate and payment schedule under the Note. *See Pl.'s Ex. A*, at 6–22. Neither the modifications nor the change in terms agreement altered aspects of the original agreement that were not expressly modified. *See, e.g., id.* at 7 ("It is agreed that except for the modification(s) contained herein, the Promissory Note, and any other Loan

---

[1] The page numbers cited throughout this Memorandum Opinion and Order refer to the Bates numbers located at the top of each document and exhibit.

Documents or Agreements evidencing, securing, or relating to the Promissory Note and all singular terms and conditions thereof, shall remain in full force and effect."). The first two modifications were relatively straightforward; executed on April 9, 2013 and July 1, 2013, they lowered the Note's interest rate and extended its maturity date. *See id.* at 6–13. On January 1, 2016, the parties executed a change in terms agreement that delayed many of Defendants' payment obligations, but that also provided for an increased interest rate and various additional remedies in the event of default. *Id.* at 14–18. *Inter alia*, the agreement permitted Plaintiff to remedy default by "tak[ing] passion of the Collateral or any part thereof" and "foreclos[ing] Lender's security interest and/or lien on any Collateral in accordance with applicable law." *Id.* at 16. These remedies were not mutually exclusive. *Id.* ("Any election . . . to pursue any remedy shall not exclude the right to pursue any other remedy."). Plaintiff assented to a final note modification on December 27, 2016, once again altering the Note's interest rate and deferring certain monthly payments. *Id.* at 19–22. This final modification also established that the Note would mature on January 5, 2018. *Id.* at 19.

Once again behind on payments and with this deadline approaching, Defendants contacted Plaintiff at some point in the second half of 2017 to "explore any option that was possible with them." *Pl.'s Ex. F*, ECF No. 76-6, at 8. Several such options were discussed, including refinancing, a short sale of the property, and—importantly for this case—a deed in lieu of foreclosure ("DIL").[2] To discuss these options, the parties scheduled a conference call for January 17, 2018, or twelve days after the maturity date laid out in the parties' final note modification. On January 10, 2018, however, a pipe in the ceiling of the Sissonville Drive property ruptured and caused extensive damage to the structure. *Pl.'s Ex. I*, ECF No. 76-9, at 13–14. The leak poured through the ceiling

---

[2] A deed in lieu of foreclosure, or DIL, would involve transferring title of the Sissonville Drive property to Plaintiff in return for a release of the Note. *Mem. in Support of Mot. for Summ. J.*, at 6.

and walls, and saturated the carpets and the baseboards. *Id.* at 15. Dragovich traveled to the property hours after the building's security system reacted to the leak, and eventually came to realize that extensive renovations would likely be necessary. *Id.*

Nevertheless, the conference call took place as scheduled one week after the leak at the Sissonville Drive property. Present on the call were Howard, Harris, and Dragovich, along with Stacy Andrews-Smith—Meridian's Asset Manager—and Ted Bradford—the Asset Management Group's Team Leader. *Pl.'s Ex. F*, at 10. Though the parties' understanding of their conversation appears to differ significantly, it is nonetheless possible to summarize the actual substance of their discussion without much difficulty. The participants began by outlining several options for resolving Defendants' inability to repay their loan, including refinancing and foreclosure. *Id.* Yet the discussion came to focus on the possibility of a DIL "as soon as [Defendants] heard what it was." *Id.* It appears that Andrews-Smith and Bradford explained the elements of a DIL and other options over the course of approximately a half an hour, though it does not appear that any specific terms were established. *Id.* Indeed, the Meridian members were made well aware that further due diligence would accompany any eventual DIL. *Pl.'s Ex. E*, at 8. There remains some dispute as to whether any water damage was mentioned on the call. *See, e.g.*, *Pl.'s Ex. I*, at 13–14. If it was mentioned, it does not appear that the scope and severity of the damage was noted. *Defs.' Ex. C*, ECF No. 80-3, at 16 ("They did tell us at that point that there was some minor damage . . . . And we did ask about that damage, and they said it was very minimal."). In any event, Andrews-Smith and Bradford ended the call by asking the Meridian members to notify them of their preferred course of action. *Pl.'s Ex. F*, at 10.

Not much discussion was necessary for Howard, Harris, and Dragovich to agree that a DIL was their universal preference. Howard emailed Andrews-Smith the same day and advised her that

the members had reviewed their options and "elected to move forward with the 'deed in lieu'
option." *Pl.'s Ex. G*, at 2. He further wrote that the members were "commit[ted] to working with
the bank and [the bank's] attorneys throughout this process." *Id.* Andrews-Smith responded
promptly, telling the members that she appreciated their quick response and that she and Bradford
would work with Plaintiff's "litigation department in the morning and get the relationship
transferred over." *Defs.' Ex. D*, ECF No. 80-4, at 1. In the same email, she noted that the members
"should expect to receive correspondence from the attorney in the next few weeks." *Id.*

On February 7, 2018, Plaintiff's attorneys sent a letter to Defendants formally advising
them that they had defaulted on the Note and demanding "immediate payment of all outstanding
principal, interest, fees and late charges due in connection with the Notes." *Pl.'s Ex. O*, ECF
No. 76-15, at 2. Instead of responding to the letter, Howard wrote Andrews-Smith and assured her
that the members "continue[d] to remain committed to work with and cooperate with [Plaintiff]
through every step of the process of the deed in lieu." *Defs.' Ex. E*, ECF No. 80-5, at 1. Andrews-
Smith advised Howard that she was "no longer managing the relationship" between Meridian and
Plaintiff, but that she had "forwarded [his] email to the Litigation department." *Id.* Harris followed
up separately on February 23, 2018, writing Andrews-Smith that he and his fellow members
"recently were told that this is headed to a foreclosure and" that they did not understand "the
change from what [the parties] had discussed earlier." *Defs.' Ex. F*, ECF No 80-6, at 2. Andrews-
Smith responded that

> Ted and I just spoke with the Asset Manager in the Litigation department regarding
> your last email. We explained that there seems to be some confusion or
> miscommunication regarding the Deed in Lieu versus Foreclosure. We were
> advised that they will have the attorney contact you to explain the process. We were
> also advised that they are still doing their due diligence (phase I environmental,
> etc.) and that nothing has been determined yet.

*Id.* at 1. Harris responded that he had "[j]ust wanted everyone to be on the same page," as "[s]ome of our recent dialog [sic] wasn't what we discussed with you guys." *Id.* Andrews-Smith said she understood Harris' worries, and that she and Bradford "wanted to make sure that they would pursue the deed in lieu *if possible* as it [is] what was previously discussed." *Id.* (emphasis added).

Eventually, Plaintiff's attorneys completed their due diligence with the receipt of an appraisal report on March 15, 2018 and an environmental report on March 18, 2018. *See Pl.'s Ex. J*, ECF No. 76-10; *Pl.'s Ex. L*, ECF No. 76-12. The appraisal report revealed that significant damage to the property had decreased its value to $225,000, or an $810,000 loss from its initial appraisal of $1,135,000. *Pl.'s Ex. J*, at 2. The environmental report contained equally bad news, characterizing the property as "High Risk" and nothing "the presence of significant mold growth and water-damaged building materials." *Pl.'s Ex. L*, at 2. In light of this decline in value, Plaintiff elected to pursue foreclosure rather than a DIL.

To recover their debt under a theory of breach of contract, Plaintiff filed its Verified Complaint on March 23, 2018 in this Court. *Compl.*, at ¶¶ 13–14. Defendants responded with a set of their own counterclaims. *See* ECF Nos. 11–14. As amended, these counterclaims raise five causes of action against Plaintiff: breach of contract, breach of the duty of good faith and fair dealing, common law fraud and misrepresentation, special duty and negligence, and promissory estoppel. *Am. Counterclaim*, ECF No. 50, at ¶¶ 1–31. While this action was pending, Plaintiff sold the Sissonville Drive property at auction on November 21, 2019, for $10,500. *Pl.'s Ex. M.*, ECF No. 13, at ¶ 3. "After deducting the cost associated with the public auction," Plaintiff "recovered $5,450." *Id.* at ¶ 4. This left Defendants with an outstanding debt of $744,017.05 as of February 13, 2020. *Id.* at ¶ 5. Plaintiff now moves for summary judgment on its breach of contract claim

and all of Defendants' counterclaims. Before turning to the substance of Plaintiff's Motion, the Court will briefly review the law that frames its analysis.

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ. Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). To demonstrate that no genuine issue of material facts exists, a moving party may rely on "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under requests for production." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984).

"On summary judgment[,] the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). In effect, this means that courts may not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Of course, this bar on "weighing" evidence does not absolve a nonmoving party from the need to offer some "concrete evidence from which a reasonable juror could return a verdict" in his or her favor. *Id.* at 256. Such a showing must consist of more than a "scintilla of evidence," *id.* at 252, or mere unsupported speculation, *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). It is this legal framework that will control the Court's consideration of the pending Motion.

### III. DISCUSSION

In considering Plaintiff's Motion, the Court will first proceed through an analysis of Defendants' counterclaims. Having done so, the Court will address whether summary judgment is warranted with respect to Plaintiff's own breach of contract claim.

#### A. Defendants' Counterclaims

##### 1. Breach of Contract

Defendants' first counterclaim is one for breach of contract. *See Am. Counterclaim*, at ¶¶ 1–6. This claim is essentially grounded in Defendants' belief that Plaintiff offered an entirely new contract for a DIL during the parties' January 17, 2018 conference call, and that their refusal to proceed with a DIL represents a breach of that agreement. *Id.* at ¶ 4. Plaintiff disagrees, arguing that their conversation—at most—constituted a non-binding "agreement to agree." *Reply*, at 5–6.

"To survive summary judgment on a breach of contract [counter]claim" under West Virginia law, "the [defendants] must provide concrete evidence on the following elements: (1) the existence of a valid, enforceable contract; (2) the [defendants'] performance under the contract; (3) the [plaintiff's] breach of its duties or obligations under the contract; and (4) resulting injury to the [defendants]." *McNeely v. Wells Fargo Bank, N.A.*, 115 F. Supp. 3d 779, 789 (S.D.W. Va. 2015). It is the first of these requirements that proves fatal to Defendants' arguments. "The elements of a contract are an offer and an acceptance supported by consideration." *Dan Ryan Builders, Inc. v. Nelson*, 737 S.E.2d 550, 556 (W. Va. 2012). An offer and acceptance must be bound by mutuality of assent, "an essential element of all contracts." *Bailey v. Sewell Coal Co.*, 437 S.E.2d 448, 450 (W. Va. 1993). "In order for this mutuality to exist, it is necessary that there be a proposal or offer on the part of one party and an acceptance on the part of the other." *Id.* Yet to even "create a power of acceptance," an "offer must be certain in its essential terms."

*Charbonnages de France v. Smith*, 597 F.2d 406, 417 (4th Cir. 1979) (looking to "West Virginia cases and to general authorities in applying the elementary principles pertinent to [this] decision").

These foundational principles of contract law lead to a single conclusion: that no mutuality of assent existed between Plaintiff and Defendants during their January 17 conference call, or even in the weeks following it, that would afford Defendants the power to accept an offer. At most, the call—which began at 3:00 p.m.—could have lasted for approximately fifty minutes. *See Pl.'s Ex. G*, at 2 (scheduling conference call for 3:00 p.m. and confirming desire to pursue DIL option at 3:53 p.m.). The parties discussed several options on the call in addition to a DIL, and it belies reason to assume that they mutually assented to *every* material term of a new, complex contract in under an hour. Defendants appear to have recognized as much, having repeatedly reaffirmed their commitment to working with Plaintiff throughout the due diligence *process* that had yet to occur. *See*, *e.g.*, *Pl.'s Ex. G*, at 2.

The nature of the purported DIL contract weighs heavily against Defendants as well. "[W]hen it is shown that the parties intend to reduce a contract to writing this circumstance creates a presumption that no final contract has been entered into, which requires strong evidence to overcome." *Sprout v. Bd. of Educ. of Cnty. of Harrison*, 599 S.E.2d 764, 768 (W. Va. 2004). While the parties never explicitly mention their intent to reduce the theoretical DIL contract to writing, the nature of such a contract makes it exceedingly unlikely that Plaintiff or Defendants would be satisfied with anything short of a written instrument. *See Blair v. Dickinson*, 54 S.E.2d 828, 844 (1949) (reasoning that, *inter alia*, courts should consider "whether the contract is of that class which are usually found to be in writing; whether it is of such nature as to need a formal writing for its full expression; whether it has few or many details; whether the amount involved is large or small; whether it is a common or unusual contract" in considering whether parties intend to reduce

an agreement to writing). Indeed, as Plaintiff points out, West Virginia law mandates that title transfers—an inherent aspect of a DIL—be reduced to writing. *See* W. Va. Code § 36-1-3. Here, no written contract concerning a DIL or title transfer was ever offered in writing, providing further evidence that no final agreement was reached on the call.

Of course, a more charitable reading of Defendants' argument might be that they believe the parties formed a binding preliminary agreement to agree on a DIL contract at a future date. *See Resp. in Opp'n*, at 10 ("By way of explanation, with the Deed-in-Lieu of Foreclosure as agreed, the parties contemplated how to satisfy the obligation and specifically contemplated how the same would be accomplished depending on the appraised value."). At the broadest level of generality, such "bare-boned 'agreements to agree' are not binding." *Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 407 (4th Cir. 2002). Indeed, "[w]hen terms are so vague and indefinite that there is no basis or standard for deciding whether the agreement has been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract." *Id.*

Two potential exceptions to this general rule exist. First, where "parties have reached a complete agreement (including the agreement to be bound) on all issues perceived to require negotiation," a preliminary agreement may be biding. *Burbach Broad. Co. of Del.*, 278 F.3d at 407. Of course, "[s]uch an agreement is preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement." *Id.* The Court's analysis on this point is rather redundant, because—as discussed above—there is no evidence suggesting that the parties reached an agreement on every material term of the hypothetical DIL contract. In fact, the evidence suggests quite the opposite; in "accepting" Plaintiff's purported offer, for example, Howard made

clear that he and the fellow Meridian members were "commit[ted] to working with the bank and your attorneys throughout *this process*." *Pl.'s Ex. G*, at 2 (emphasis added).

The second potential exception to the rule against binding preliminary agreements is equally unavailing to Defendants. In narrow circumstances, parties may bind themselves "to negotiate . . . open issues in good faith in an attempt to reach the contractual objective within the agreed framework." *Burbach Broad. Co. of Del.*, 278 F.3d at 407. This prevents a party from "renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." *Id.* Yet such preliminary agreements do not guarantee that an agreement will be reached, because "it is possible that the parties will not eventually come to agreement after negotiating in good faith on other terms, or that circumstances may change, and the parties may abandon the agreement." *Akers v. Minn. Life Ins. Co.*, 35 F. Supp. 3d 772, 786 (S.D.W. Va. 2014). Assuming for the sake of argument that the parties reached such an agreement here—a proposition that is far from certain[3]—it is plain that changed circumstances following the call justified Plaintiff's decision not to execute a final contract respecting a DIL with Defendants. Indeed, it appears that Plaintiff conducted due diligence in good faith and only elected to pursue foreclosure after two separate reports revealed significant damage to the property—just the sort of change in circumstance that may justify a party's abandonment of a final contract. *See Akers*, 35 F. Supp. 3d at 786. It follows that no theory of contract law supports the idea that the parties either

---

[3] Courts consider five factors in determining whether a preliminary agreement to negotiate in good faith has been reached: "1) the language of the agreement, 2) the existence of open terms, 3) whether there has been partial performance, 4) the context of negotiations, and 5) the custom of such transactions." *Burbach Broad. Co. of Del.*, 278 F.3d at 408. The language of the agreement is the most important factor, but the other factors are relevant here as there is no written agreement for the Court to parse. *Id.* In any event, there were clearly substantial open terms following the call, there was no partial performance to speak of (beyond Plaintiff's own due diligence, that is), the "negotiations" consisted of a brief phone call, and it seems highly unlikely that Plaintiff customarily entered into binding agreements limiting its remedies for default via conference call.

reached a final, binding agreement during the conference call, or that Plaintiff breached a binding agreement to agree in the future. Plaintiff is therefore entitled to summary judgment with respect to Defendants' first counterclaim.

### 2. Breach of the Duty of Good Faith and Fair Dealing

Defendants next argue that Plaintiff "breached the duty of good faith and fair dealing implied in the 'Note.'" *Am. Counterclaim*, at ¶ 8. Plaintiff counters by arguing that it acted "within the rights provided under the Note," and therefore "did not breach the duty of good faith and fair dealings." *Mem. in Support of Mot. to Dismiss*, at 16. Plaintiff further claims that, if anything, Defendants breached their own duty of good faith and fair dealing in failing to notify it of the extensive damage to the Sissonville Drive property during the January 17, 2018 conference call. *Id.*

"West Virginia law 'implies a covenant of good faith and fair dealing in every contract for purposes of evaluating a party's performance of that contract.'" *Corder v. Countrywide Home Loans, Inc.*, No. 2:10-0738, 2011 WL 289343, at *3 (S.D.W. Va. Jan. 26, 2011) (quoting *Stand Energy Corp. v. Columbia Gas Transmission*, 373 F. Supp. 2d 631, 644 (S.D.W. Va. 2005)). Yet the Supreme Court of Appeals of West Virginia has "'declined to recognize an independent claim for a breach of the common law duty of good faith,' and has instead held that such a claim sounds in breach of contract." *Id.* (quoting *Doyle v. Fleetwood Homes of Va.*, 650 F. Supp. 2d 535, 541 (S.D.W. Va. 2009)). As such, the Court construes Defendants' counterclaim as implied in its counterclaim for breach of contract. Even with the benefits of such a liberal construction, however, Defendants' counterclaim fails for the simple reason that "[t]he implied covenant of good faith and fair dealing cannot give contracting parties rights which are inconsistent with those set out in the contract." *Barn-Chestnut, Inc. v. CFM Dev. Corp.*, 457 S.E.2d 502, 509 (W.Va.1995). Here,

Plaintiff maintained the unqualified right under the Note to foreclose on the Sissonville Drive property—a right it elected to exercise after learning of the property's lessened value.

In an attempt to circumvent this unfavorable law, Defendants lean heavily on *Warden v. PHH Mortgage Corporation*, No. 3:10-CV-75, 2010 WL 3720128 (N.D.W. Va. Sept. 16, 2010). In *Warden*, Judge Bailey was confronted with plaintiffs who claimed they promised and paid their defendant lender $1,600.00 to consider their loan current. *Id.* at *5. Instead of doing so, the plaintiffs alleged that the defendant breached their agreement and sought foreclosure. *Id.* Judge Bailey reasoned that this subsequent agreement to consider the loan current could serve as the basis for an underlying breach of contract claim, which could in turn support a claim for breach of the implied covenant of good faith and fair dealing. *Id.* Two obvious factors distinguish *Warden* from the instant case. First, the plaintiffs in *Warden* were proceeding on a motion to dismiss and their factual allegations were accepted as true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The Court is under no similar obligation in this case, and instead takes the evidence in the light most favorable to Defendants. Second, the Court has already concluded that no subsequent contract was formed that would bind Plaintiff to any sort of remedy. Where there is no subsequent agreement that could serve as the basis for a breach of contract claim, *Warden* is simply inapplicable. *See*, *e.g.*, *Spoor v. PHH Mortgage Corp.*, No. 5:10CV42, 2011 WL 883666, at *5 (N.D.W. Va. Mar. 11, 2011) (reasoning that "[u]nlike the *Warden* case, [the plaintiff's] first amended complaint does not allege any specific agreement regarding loan modification that could be interpreted as a new and enforceable contract" and that "no such similar claim for breach of contract [exists] in this case"). Simply put: Defendants' failure to establish the existence of a valid, enforceable contract to pursue a DIL is fatal to their counterclaim for breach of the implied duty of good faith and fair dealing. West Virginia law "does not require creditors in a deed of trust, or

-13-

their representatives, to pursue remedies that are not set out in the deed of trust or any relevant statute to attempt to cure a default prior to pursuing a foreclosure," *Lucas v. Fairbanks Capital Corp.*, 618 S.E.2d 488, 490, Syl. Pt. 5 (W. Va. 2005), and so Plaintiff is entitled to summary judgment on Defendants' second counterclaim.

### 3.   Common Law Fraud and Misrepresentation

Defendants' next counterclaim is one for fraud and misrepresentation. *See Am. Counterclaim*, at ¶¶ 11–18. In particular, they argue that "[b]y offering the Deed-in-Lieu of Foreclosure with apparent authority to do so, Plaintiff absolutely" fraudulently or negligently misrepresented their plans to offer a DIL. *Resp. in Opp'n*, at 15. Plaintiff argues that Defendants fall short on each necessary element of both torts. *Reply*, at 11.

To make out a claim for fraud under West Virginia law, a party must establish "(1) that the act claimed to be fraudulent was the act of the [plaintiff] or induced by him; (2) that it was material and false; (3) that [the defendant] relied upon it and was justified under the circumstances in relying upon it; and (4) that he was damaged because he relied upon it." *Bowens v. Allied Warehousing Servs., Inc.*, 729 S.E.2d 845, 852 (2012) (internal punctuation omitted). As an initial matter, the Court notes that "[a]ctionable fraud must ordinarily be predicated upon an intentional misrepresentation of a past or existing fact and not upon a misrepresentation as to a future occurrence." *Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 568, 576 (2013). It is unclear what "past or existing" fact that Defendants believe is the source of Plaintiff's purported fraud; at most, it appears they are alleging that Andrews-Smith and Bradford affirmatively misled them as to the likelihood of a DIL in the future. Even so, their fraud claims fail for an even clearer reason: that they have not pointed to any injury resulting from Plaintiff's allegedly fraudulent statements. The closest they come to doing so is to argue that their decision

-14-

to stop pursuing other potential avenues to resolve their default represents some type of prejudice, but this is a meritless claim. Even Defendants appear to recognize that the decision to cease pursuit of refinancing or another note modification was theirs alone, and that Plaintiff never conditioned the availability of a DIL on their forbearance from other options. *See Pl.'s Ex. F*, at 11 ("Q: Do you recall a time prior to that call where the option to refinance was kind of taken off the table? A: I don't specifically recall that.").

Defendants' counterclaims for negligent misrepresentation also fail, but for an even more apparent reason. As an initial matter, it is true that West Virginia recognizes a cause of action for negligent misrepresentation. *Folio v. City of Clarksburg*, 655 S.E.2d 143, 151 (2007) ("One under a duty to give information to another, who makes an erroneous statement when he has no knowledge on the subject, and thereby misleads the other to his injury, is as much liable in law as if he had intentionally stated a falsehood." (internal quotations omitted)). Yet "a successful claim for negligent misrepresentation would require a finding that [Plaintiff] maintained a *special relationship or duty* to [Defendants]." *Kidd v. Mull*, 595 S.E.2d 308, 317 (2004) (emphasis added). Where the relationship between a lender and a borrower is customary, and where a lender does not "endeavor to perform uncustomary services for [Defendants], possess information of unique relevance to [Defendants] in regard to this claim, or participate in any conduct which could arguably be seen as creating a special relationship with [Defendants]," a claim for negligent misrepresentation claim must fail. *Tinsley v. OneWest Bank, FSB*, 4 F. Supp. 3d 805, 839 (S.D.W. Va. 2014). In arguing that a special relationship existed here, Defendants argue that Plaintiff's decision to transfer control of their account to a special asset management unit in Florida—as well as the involvement of the Team Leader of that unit on their call, Tom Bradford—somehow renders their relationship "uncustomary." *Resp. in Opp'n*, at 17–18. Yet the services provided to

-15-

Defendants by this unit do not create any sort of positive legal duty; indeed, its primary purpose seems to have been to work with Defendants to fashion a suitable remedy to their default, if possible. Indeed, the crux of this case—a foreclosure following three contractual note modifications and a change in terms agreement—reveals the underlying flaw with Defendants' argument: that Plaintiff never took any action with respect to Defendants' Note beyond their contractual relationship as lender and borrowers. *See*, *e.g.*, *McNeely v. Wells Fargo Bank, N.A.*, No. 2:13-cv-25114, at *6 (S.D.W. Va. Dec. 10, 2014) (Goodwin, J.) (ruling that negligence claim failed where complaint did not allege duties apart from those required by West Virginia Consumer Credit Protection Act); *Hanshaw v. Wells Fargo Bank, N.A.*, No. 2:14-cv-28042, 2015 WL 5345439, at *19 (S.D.W. Va. Sept. 11, 2015) (Johnston, J.) (dismissing negligence claim where borrower failed to plead allegations supporting a special relationship); *Ranson v. Bank of Am.*, *N.A.*, No. 3:12-5616, 2013 WL 1077093, at *6 (S.D.W. Va. Mar. 14, 2013) (Chambers, J.) (concluding that no special relationship existed between lender and borrower). Plaintiff is therefore entitled to summary judgment with respect to Defendants' fraud and negligent misrepresentation counterclaim.

### 4.  Special Duty and Negligence

Defendants' penultimate counterclaim is one for negligence, and is once again predicated on the notion that a special extra-contractual relationship existed between Plaintiff and Defendants. *Am. Counterclaims*, at ¶¶ 19–24. Specifically, they claim that Plaintiff "created a special duty with Counter Claim Plaintiffs during the course of loan to ensure that the subject 'Note' was refinanced and to disclose accurate and timely information." *Id.* at ¶ 20. Plaintiff argues that no such special relationship existed, and that it upheld any extra-contractual duties even if one did. *Reply*, at 13–14.

Given Defendants' prior counterclaim for negligent misrepresentation, the Court's analysis on this issue is somewhat repetitive. Broadly speaking, a party "cannot maintain an action in tort for an alleged breach of a contractual duty" under West Virginia law. *Lockhart v. Airco Heating & Cooling*, 567 S.E.2d 619, 624 (W. Va. 2002) (footnote omitted). Instead, "[t]ort liability of the parties to a contract arises from the breach of some positive legal duty imposed by law because of the relationship of the parties, rather than a mere omission to perform a contract obligation." *Id.* "In the lender-borrower context, courts consider whether the lender has created such a 'special relationship' by performing services not normally provided by lender to a borrower." *Warden*, 2010 WL 3720128, at *9. "The possession of information unique to the lender can also indicate a special relationship." *Tinsley*, 4 F. Supp. 3d at 839.

As noted earlier, Defendants attempt to establish a special relationship by relying on several key pieces of information. First, they point to their account's transfer to a specialized unit in Florida. *Resp in Opp'n*, at 17. Second, they point to the personal involvement of that unit's Team Leader. *Id.* Third, they claim that Plaintiff withheld information of "unique significance," including limitations on the availability of a DIL, the role of other departments in the approval process, and a warning "not to cease working towards all of their options." *Id.* at 17–18. None of this is sufficient to actually create a special relationship. The fact that Defendants' account was transferred to a special unit—or that a relatively high-ranking employee was involved in managing it—does not demonstrate that Plaintiff provided a *service* not normally provided by a lender to a borrower. Indeed, the "service" provided by the specialized asset management unit falls well within the parameters of a lender/borrower relationship—that is, attempting to remedy a default.[4]

---

[4] There is a degree of irony in Defendants' argument here as well. If every lender who worked with borrowers to pursue mutually-beneficial solutions to default—even where such solutions are ultimately determined to be unworkable—were subject to tort liability for their

Finally, the allegedly "unique" information Defendants draw on is actually just material related to their contractual relationship as lender and borrowers. Of course, this too is insufficient to create a special relationship. As such, Plaintiff is entitled to summary judgment on Plaintiff's negligence and special duty counterclaim.

### 5. Promissory Estoppel

Defendants' final counterclaim is styled as one for promissory estoppel, but overlaps heavily in substance with a claim for equitable estoppel.[5] *Am. Counterclaims*, at ¶¶ 25–31. The thrust of their argument is that Plaintiff's employees "promised to accept the property securing the 'Note' in exchange for pursuing judicial foreclosure." *Id.* at ¶ 27. They argue that this promise should estop Plaintiff from "asserting its Claims against the Defendants after having induced them to detrimentally change their position in reliance thereon." *Resp. in Opp'n*, at 18. Plaintiff argues

---

actions, they would be disincentivized from offering the types of remedies and services Defendants appear to favor.

[5] "Courts have recognized that '[t]here are several estoppel doctrines, including equitable estoppel, judicial estoppel, promissory estoppel, estoppel by record, estoppel by deed, and collateral estoppel.'" *W. Va. Dept. of Transp., Div. of Highways v. Robertson*, 618 S.E.2d 506, 512 (W. Va. 2005). Indeed, the very notion of "'[e]stoppel' is not a single coherent doctrine, but a complex body of interrelated rules." *Id.* (quoting *Whitacre P'ship v. Biosignia, Inc.*, S.E.2d 870, 879 (N.C. 2004)). Here, Defendants' counterclaims appear to more neatly fit the parameters of equitable—rather than promissory—estoppel, as they seek to "prevent the Plaintiff from asserting its Claims against the Defendants after having induced them to detrimentally change their position in reliance thereon." *Resp. in Opp'n*, at 18. This distinction is relevant only because Defendants do not appear to seek *enforcement* of Plaintiff's alleged promise in this counterclaim, but rather *estoppel* of Plaintiff's ability to exercise its rights under the original Note. Of course, for the purposes of the substance of Defendants' counterclaims, this represents more a legal distinction than an actual difference; both doctrines involve related tests that include inquiries into detrimental reliance and prejudice. *Compare Stuart v. Lake Washington Realty Corp.*, 92 S.E.2d 891, 893, Syl. Pt. 6 (W. Va. 1956) (equitable estoppel) *with Everett v. Brown*, 321 S.E.2d 685, 686, Syl. Pt. 3 (W. Va. 1984) (promissory estoppel). In any event, the Court will consider Defendants' counterclaims under both doctrines. *See Blackwood v. Berry Dunn, LLC*, No. 2:18-cv-1216, 2019 WL 3323350, at *3 (S.D.W. Va. July 24, 2019) (combining tests for both equitable and promissory estoppel).

that Defendants are incorrect for several reasons, including that they did not rely on any statements to their detriment. *Reply*, at 16.

As an initial matter, Plaintiff suggests that equitable estoppel is an affirmative defense rather than an independent cause of action. This much is far from clear, as "[t]he Supreme Court of Appeals of West Virginia has treated equitable estoppel as a viable cause of action." *Holtzapfel v. Wells Fargo Bank, N.A.*, No. 2:12-00937, 2013 WL 1337283, at *5 (S.D.W. Va. Mar. 29, 2013) (Copenhaver, J.) (citing *Folio*, 655 S.E.2d at 148; *Cleaver v. Big Arm Bar & Grill, Inc.*, 502 S.E.2d 438, 443–45 (W. Va. 1998)); *but see Warden*, 2010 WL 3720128, at *7 (Bailey, J.) (reasoning that "equitable estoppel has no place in the plaintiffs' Complaint" where the plaintiffs had already pleaded equitable estoppel as an affirmative defense). The Court is persuaded by Judge Copenhaver's reasoning, and will treat Defendants' counterclaim as an independent cause of action.

To succeed on an equitable estoppel claim in West Virginia,

[1] [t]here must exist a false representation or a concealment of material facts; [2] it must have been made with knowledge, actual or constructive, of the facts; [3] the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; [4] it must have been made with the intention that it should be acted on; and [5] the party to whom it was made must have relied on or acted on it to his prejudice.

*Corder*, 2011 WL 289343, at *7 (brackets in original) (quoting *Stuart v. Lake Washington Realty Corp.*, 92 S.E.2d 891, 893, Syl. Pt. 6 (1956)). Similarly, promissory estoppel may apply where a party makes "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable . . . if injustice can be avoided only by enforcement of the promise." *Everett v. Brown*, 321 S.E.2d 685, 686, Syl. Pt. 3 (W. Va. 1984). Though the parties argue about entangled issues under both frameworks, it is the requirement of detrimental reliance (or prejudice,

depending on one's preferred syntax and equitable doctrine) that is immediately fatal to Defendants' counterclaim.

To demonstrate an injury resulting from their reliance on Plaintiff's purported offer of a DIL, Defendants contend that they ceased pursuit of other alternative remedies available under the Note.[6] This may very well be true; having elected to pursue a DIL, it seems logical enough that Defendants would stop pursuing refinancing or other potential avenues for relief. *See Pl.'s Ex. E*, at 4–5. Yet Defendants have presented no evidence at all that the possibility of a DIL was ever conditioned upon their decision to cease pursuit of further refinancing or another remedy. To the contrary, Howard acknowledged that the option to refinance was never "taken off the table." *See Pl.'s Ex. F*, at 11. The fact that Defendants voluntarily chose to cease their pursuit of other options without any prompting by Plaintiff is not prejudice, and so their counterclaim for estoppel must fail.[7] Summary judgment in Plaintiff's favor is therefore warranted on Defendants' final counterclaim.

**B. Plaintiff's Breach of Contract Claim**

Having disposed of Defendants' counterclaims, the Court turns to Plaintiff's single claim for breach of contract. *Compl.*, ¶¶ 8–17. Plaintiff's argument is straightforward: that the Note and its subsequent modifications provided for a maturation date of January 5, 2018, that all outstanding

---

[6] Notably, Defendants claim one of the alternatives they ceased pursuing was "voluntary" submission "to the protections of Judicial Foreclosure." *Resp. in Opp'n*, at 18–19.

[7] The Court also emphasizes that the Note matured on January 5, 2018—twelve days before the parties' conference call. As of that date, Defendants were entitled to foreclose on the property. If Defendants truly believed that Plaintiff had entirely foresworn its ability to foreclose at any point in the future during the conference call, their reliance on this belief was unreasonable. *See, e.g.*, *Stoler v. PennyMac Loan Servs., LLC*, No. 2:18-cv-00988, 2019 WL 691406, at *6 (S.D.W. Va. Feb. 19, 2019) (reasoning that "common sense would not suggest[] that PennyMac represented to the plaintiff that it would provide assistance and not pursue foreclosure in all circumstances—even if the plaintiff became unable to make any payments").

debts became due on that day, and that the Note and the Meridian members' Guaranty Agreements are consequently in default for nonpayment. *Id.* Rather than respond directly to these arguments, Defendants once again turn to their theory that the parties entered into a new contract on January 17, 2018 that "resulted in the Note being satisfied, and the Deed of Trust and Guarantees released thereafter." *Resp. in Opp'n*, at 11.

As noted earlier, "the elements of breach of contract" under West Virginia law "are (1) a contract exists between the parties; (2) a defendant failed to comply with a term in the contract; and (3) damage arose from the breach." *Wittenberg v. Wells Fargo Bank, N.A.*, 852 F. Supp. 2d 732, 749 (N.D.W. Va. 2012). As an initial matter, Defendants do not appear to dispute the second and third elements of this test. This narrows the Court's inquiry to a single question: whether the terms of the Note, Deed of Trust, and Guaranty Agreement were still valid and enforceable at the time of Defendants' alleged (and ongoing) breach. And on this point, the Court's earlier analysis of Defendants' breach of contract counterclaim is dispositive. Defendants simply have not presented sufficient evidence to conclude that Plaintiff offered them anything more than the sort of "bare-boned agreement[] to agree" that is not binding in West Virginia. *Burbach Broad. Co. of Del.*, 278 F.3d at 407. No reasonable trier of fact could look at the scintilla of evidence Defendants have presented—which is comprised of subjective and conclusory statements by each of the Meridian members attesting to their belief that Plaintiff had offered them a DIL—and conclude that a new contract was formed to supplant the written terms of the parties' original agreement. Defendants' only other evidence is comprised of emails exchanged between Plaintiff and the Meridian members, but these are vague and often make points directly contrary to Defendants' arguments. *See*, *e.g.*, *Defs.' Ex. F*, at 2 (confirming Andrews-Smith "wanted to make sure that [Plaintiff's litigation department] would pursue the deed in lieu *if possible* as it [is] what was

previously discussed"). In none of these emails do Plaintiff's employees represent that a binding agreement, or even an agreement to agree, was reached. For that matter, neither do Defendants; their own emails simply reference the parties' earlier *discussions* rather than any substantive, binding agreement. *See id.* (noting Harris' confusion regarding "the change from what [the parties] had *discussed* earlier" (emphasis added)). This is insufficient to demonstrate the existence of a contract supplanting the parties' earlier agreement, which Defendants breached by defaulting on the terms of the Note on January 5, 2018. Plaintiff is thus entitled to summary judgment on its breach of contract claim.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment, ECF No. 76, is **GRANTED**, in the principal sum of $614,341.73, plus accrued interest of $9,594.85 through March 22, 2018, and late fees and other charges of $8,065.88, for a total of $632,002.46, together with pre-and post-judgment interest after March 22, 2018 at a per annum rate equal to Plaintiff's Prime Rate, as announced from time to time, plus 5% until paid, and for Plaintiff's reasonable attorney's fees and costs incurred in attempting to collect the indebtedness due under the Note and Guaranty Agreement. The Court accordingly **ORDERS** this case removed from its docket.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        April 17, 2020

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

-22-